## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MACHERIE EVERSON,

     *Plaintiff*,

v.

CONGRESSIONAL BLACK CAUCUS
FOUNDATION, INC.,

     *Defendant*.

Civil Action No. 19-2720 (TJK)

## MEMORANDUM OPINION AND ORDER

    Macherie Reese Everson, a former fellow with the Congressional Black Caucus Foundation, sued the CBCF for employment discrimination based on sexual harassment, retaliation, and several common law torts.  The CBCF now moves to dismiss, arguing that most of Everson's claims are untimely and the remainder fail to state a claim.  For the reasons discussed below, the Court will grant the motion in almost all respects, except as to certain aspects of Counts V, VIII, and IX.

## I.    Background

### A.    Factual Background

    According to the amended complaint, the Congressional Black Caucus Foundation, Inc. ("CBCF") "is a Section 501(c)(3) nonprofit nonpartisan public policy, research and educational institute[.]"  ECF No. 12-2 ("Def.'s Mem.") at 3; *see* ECF No. 8 ("Am. Compl.") ¶ 7.[1]  Its Congressional Fellowship Program provides "early career policy professionals" with "hands-on public policy training as full-time legislative aides and policy analysts."  Def.'s Mem. at 4.

---

[1] Everson filed her amended complaint and exhibits as one document.  For ease of reference, the Court will use "Am. Compl." to refer to pages 74 to 109 of ECF No. 8, which contain all the allegations in Everson's amended complaint.

CBCF's Director is Aujanette Shaunise Washington and the Fellowship Coordinator is Christina Sullivan-Mutia.  *See* Am. Compl.  ¶¶ 10–12.

Everson is a former fellow whose term began in 2012.  *See id.* ¶ 20.  As part of her fellowship, she worked in the office of U.S. Representative Robert C. "Bobby" Scott, a member of the Congressional Black Caucus.  *Id.* ¶¶ 8, 22.  Everson allegedly experienced "discomfort" in the office.  *Id.* ¶ 26.  She says that Scott's Legislative Director, Ilana Brewer, suggested that she "stay after work so that she could build a relationship with the Congressman" and told her that she did not need to wear suit jackets over her blouses, which Everson interpreted as sexualized remarks.  *Id.* ¶ 23.  Everson alleges that Scott was "touchy feely," and that he "touch[ed] her on her knee while riding on the monorail between the Senate buildings while asking her intimate questions[.]"  *Id.* ¶ 27.  According to Everson, Scott invited her to "events that would require him to give her a ride home."  *Id.*

Everson alleges that she observed Scott and Lauren Victoria Burke, a friend of Scott's, *see id.* ¶ 62, exit "the bathroom in his office with disheveled clothing."  *Id.* ¶ 28.  Scott and Burke gave Everson a ride home after an event, and in the vehicle, Everson found "a strap-on dildo under the driver's seat," which made her so "uncomfortable [that she] got out three blocks away from her house and walked home."  *Id.* ¶ 29.  In April 2013, Scott's "sexual overtures" prompted Everson to inform Sullivan-Mutia of her desire to leave the office and to find an assignment on a committee that Scott did not sit on.  *Id.* ¶¶ 30–31.  Everson also alleges that once, Scott asked her if she would be "good" if she staffed him on an event, and when she responded affirmatively, said, "If you're going to be good, then what's the point of you coming?"  *Id.* ¶ 33.  Scott then allegedly asked Everson to "flirt" with him at the event, and Everson rejected his overtures.  *Id.*

2

Everson interpreted these incidents as Scott's efforts to "change [her] job description to include sex worker." ECF No. 20-5 ("Pl.'s Opp.") at 5. Further, she concluded "that she would have to acquiesce to his request or find a new place to work." *Id.*

In March 2013, Everson alleges that she met with Lonnie Johnson, a member of the CBCF's Board of Directors whom she had met before at a CBCF event, in the cafeteria in the Longworth House Office Building. *See* Am. Compl. ¶¶ 9, 37; Pl.'s Opp. at 4. Johnson allegedly told Everson that he would help her with her career, but "that he spent 5 days a week in DC and his wife never came up and that while he was in town he needed something soft to come home to." Am. Compl. ¶ 37. Plaintiff, who construed these statements as a proposition for a sexual relationship, declined Johnson's offer and left the meeting. *See id.*; Pl.'s Opp. at 4.

In June that year, Everson resigned from Scott's office after giving only a few days' notice, hoping to get a position on a committee chaired by a female member of Congress. Am. Compl. ¶¶ 38, 40. Later that month, she accepted a job with the House Financial Services Committee. *Id.* ¶ 41. The committee's Chief of Staff, Charla Ouertatani, allegedly asked Everson why she wanted to leave Scott's office, and after some hesitation, she explained "that she had an inappropriate experience with the Congressman and was trying to protect herself by working for a committee staff of a female Member." *Id.* ¶ 42. Ouertatani pressed further, and Everson explained that Scott sexually harassed her. *Id.* Ouertatani allegedly told Everson that Scott's Chief of Staff, Joni Ivey, "was 'badmouthing' her for 'burning her bridge.'" *Id.* Ouertatani allegedly encouraged Everson to "smooth things over," Pl.'s Opp. at 6, and "make amends for any possible bridges that were burned," Am. Compl. ¶ 43, arising from her abrupt departure from Scott's office. *See* Pl.'s Opp. at 6. To this end, Sullivan-Mutia advised Everson to write Ivey a letter. *See* Am. Compl. ¶ 43; *see also* ECF No. 8 at 169–72; Pl.'s Opp. at 6.

Everson did so, apologizing to Ivey for leaving abruptly and missing her exit meeting, claiming that she did so because she was "overwhelmed by the process of starting in a new office," and saying that she "truly value[d] and appreciate[d] the time spent with [Ivey] and Team Scott." ECF No. 8 at 170; *see* Am. Compl. ¶ 44. According to Everson, Sullivan-Mutia indicated to her that she would help Everson find a placement on a Senate committee if she wrote the letter, but reneged afterward. Pl.'s Opp. at 6.

But even after moving to the House Financial Services Committee, Everson alleges that she "began to receive abusive treatment from . . . Ouertatani in the form of refusal of work her plan [sic] and conflicting directions." Am. Compl. ¶ 45; *see* Pl.'s Opp. at 6. Sullivan-Mutia allegedly requested that Everson "be released from the [Financial Services] Committee and returned to the CBCF for 'professional development.'" Pl.'s Opp. at 6; *see* Am. Compl. ¶ 46. Upon her return to the CBCF, Sullivan-Mutia placed Everson on a performance improvement plan ("PIP") "with trumped up allegations." Am. Compl. ¶ 47. Everson allegedly disputed the characterization of her performance in the PIP and added her own addendum to the document. *Id.*; ECF No. 8 at 176–78. She alleges that her "release" from the Financial Services Committee was effectively a termination. Am. Compl. ¶ 46. Even after Everson completed this "coaching and mentoring," she allegedly "would not be allowed to return to Congress," *id.*, or to work on the Hill again. Pl.'s Opp. at 6. She claims that the PIP and her discharge from the Financial Services Committee were retaliatory actions taken by Sullivan-Mutia and the CBCF for telling Ouertatani about the harassment she experienced from Scott. Am. Compl. ¶ 47.

Everson "filed a formal complaint with the CBCF" on November 25, 2013 about the harassment and retaliation she had experienced. *Id.* ¶ 50. She allegedly intended "to ask CBCF leadership how to succeed in the workplace without having to sleep her way to the top[.]" *Id.*

Days later, on December 6, 2013, the CBCF terminated her.  *Id.*  CBCF Director Washington

asked her to sign a separation agreement, and Everson refused to do so.  *Id.*; *see* ECF No. 8 at

180–82*.*

After her termination, Everson interviewed for an unpaid fellowship with U.S.

Representative Gary Peters.  Am. Compl. ¶ 51.  Allegedly because she could not get a reference

from the CBCF or Scott, Representative Peters declined to extend her an offer.  *Id.*  Unable to

secure another placement, she alleges that her "career was derailed as a result of the House

Financial Services Committee and the CBCF firing her." *Id*. ¶¶ 49–55.

In 2014, Everson "wrote a book to help women address sexual harassment in the

workplace" based on her experience with the CBCF.  *Id.* ¶ 56.  She released her book in January

2015 and again in January 2016 and launched a national book tour in 2017.  *Id.* ¶¶ 56–57.

Everson appeared on Fox News in November 2017, and with her attorney, held a press

conference the next month, to discuss the sexual harassment she had experienced during her

fellowship.  *See id.* ¶¶ 59, 61.  At the press conference, Everson mentioned Scott by name and

spoke of the "CBCF's continual work to silence and blackball her."  *Id.* ¶ 61.

Everson alleges that the CBCF continued its campaign of retaliation against her by

working to minimize the success of her tour and "silence her and financially assassinate her." *Id.*

¶ 65.  For example, Everson alleges that an engagement with the Women's Democratic Network[2]

in November 2017 was "mysteriously cancelled" after she posted notice of the event on social

media.  *Id.* ¶ 57.  She also claims that at the Essence Festival in July 2017, Scott "entered the

bookstore . . . in the Ernest Morial Convention Center, alone and stood grimacing [at] Ms.

---

[2] In her opposition, Everson appears to call this organization the Women's Information Network.
*See* Pl.'s Opp. at 36–37.

Everson as she signed books and talked to customers[.]" *Id.* ¶ 58.  And she alleges that Burke, Scott's friend, "slander[ed]" her in December 2017 and attended her speaking engagement in May 2018 "to intimidate her." *Id.* ¶¶ 62–63.  Finally, Everson was invited to speak on a panel sponsored by the Oracle Group International ("Oracle Group") and hosted by Angel Livas in September 2018, during the CBCF Annual Legislative Conference. *Id.* ¶ 64.  Despite Everson's participation in other events, including the CBCF's Annual Legislative Conference in 2017, Everson alleges that Livas told her she had been "un-invited" from the panel "because she had a lawsuit filed against a CBC Member (which wasn't true)." *Id.*  Further, Everson alleged that Livas's radio interview of her, which was supposed to air around the same time in September 2018, "was . . . pulled" because of CBCF retaliation. *Id.* ¶ 65.

### B.    Procedural Background

In October 2014, Everson filed a charge of discrimination with the District of Columbia Office of Human Rights (DCOHR). *Id.* ¶ 54; ECF No. 8 at 193.  She alleged that the CBCF discriminated against her based on her sex and in retaliation for having reported sexual harassment, and that the events prompting these allegations occurred between October 11, 2013 and December 6, 2013.  ECF No. 8 at 193.  Everson withdrew the 2014 DCOHR charge in November or December 2017 on her attorney's advice. *See* Am. Compl. ¶¶ 54, 60.[3]

---

[3] The CBCF includes as an exhibit to its motion a document purporting to be an administrative dismissal notice from DCOHR dated November 29, 2017, stating that Everson's complaint was dismissed at her request.  ECF No. 12-3 at 7–8.  Everson disputes the validity of this document, stating that she has "never seen [it] before."  Pl.'s Opp. at 22.  But she alleges that her attorney advised her to withdraw her charge in November 2017, does not dispute that she withdrew the claim, and alleges that her file "sat with the DC OHR from 2014 until December 2017."  Am. Compl. ¶¶ 54, 60.  The Court thus construes her to allege that she withdrew her claim, at the latest, on December 31, 2017.

Around the same time in October 2014, Everson completed an Equal Employment Opportunity Commission (EEOC) Intake Questionnaire.  *See* ECF No. 20-3.  Generally, Plaintiff conveyed her belief that the CBCF discriminated against her based on her sex when it subjected her to sexual harassment and that it retaliated against her by terminating her employment.  *See id.* at 2.  Immediately preceding the signature block is a preprinted paragraph which read:

> **Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire**.  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws.  **If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge . . . you may wish to check Box 1.  If you want to file a charge, you should check Box 2.**

*Id*. at 4 (emphasis in original).  A similar notice appears at the top of the first page of the questionnaire.  *See id.* at 1.  Plaintiff checked Box 1.  *Id.* at 4.  The text in Box 1 read:

> I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box, I have not filed a charge with the EEOC.  **I also understand that I could lose my rights if I do not file a charge in time.**

*Id*. (emphasis in original).

Everson filed a charge of discrimination with the EEOC on March 5, 2019, alleging discrimination based on race and sex as well as retaliation.  *See* ECF No. 12-3 at 10–11.[4]  She alleged that the discrimination occurred between May 1, 2013 and September 3, 2018.  *Id.* at 10.

---

[4] The Court may consider the CBCF's exhibits pertaining to the DCOHR and EEOC Charges because the amended complaint refers to them.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (permitting the court to "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice").

The EEOC issued her a right to sue notice on June 17, 2019.  *See* ECF No. 8 at 110.  Proceeding *pro se*, she filed this suit in September 2019 and amended her complaint in October 2019, setting forth ten counts.  She has since withdrawn her civil rights claims under 42 U.S.C. § 1983 (Counts I and II).  Pl.'s Opp. at 3; ECF No. 20 at 1.  Remaining are three claims (Counts III, IV and V) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, three claims (Counts VI,[5] VII, and VIII) under the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401 *et seq.*, and two tort claims (Counts IX and X) under District of Columbia common law.  The CBCF moves to dismiss them all, arguing that many of Everson's allegations are untimely, and the remainder fail to state claims upon which relief can be granted.

## II.    Legal Standard

Under Rule 12(b)(6), the Court must dismiss a claim if a plaintiff fails to plead "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  Even so, "a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  When considering a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies

---

[5] Everson appears to have mistakenly omitted the heading for Count VI, which should allege discrimination based on sex in violation of the DCHRA.  *See* ECF No. 20 at 2; Pl.'s Opp. at 21; Def.'s Mem. at 12 n.9; Am. Compl. ¶¶ 108–15.

even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017) (quoting *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011), *aff'd*, 894 F.3d 298 (D.C. Cir. 2018).

While a *pro se* complaint "must be construed liberally, the complaint must still 'present a claim on which the Court can grant relief.'" *Budik v. Dartmouth-Hitchcock Med. Ctr.*, 937 F. Supp. 2d 5, 11 (D.D.C. 2013) (quoting *Chandler v. Roch*, 215 F. Supp. 2d 166, 168 (D.D.C. 2002)). "A court considering a *pro se* plaintiff's complaint should look to all filings, including filings responsive to a motion to dismiss, to discern whether the plaintiff has nudged her claims across the line from conceivable to plausible." *Mehrbach v. Citibank, N.A.*, 316 F. Supp. 3d 264, 268 (D.D.C. 2018) (cleaned up); *see Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).

## III.      Analysis

### A.      Timeliness

The CBCF moves to dismiss all of Counts III, IV, VI, and VII and part of Counts V, VIII, IX, and X as untimely. *See* Def.'s Mem. at 2–3. Everson admits that the relevant claims are untimely but argues that the Court should equitably toll the limitations periods. *See* ECF No. 20 at 1–2. The Court agrees with the CBCF that Everson's claims are untimely and that there is no reason to equitably toll the limitations periods.

### 1.      Title VII Discrimination (Counts III and IV)

The CBCF argues that Everson failed to exhaust her administrative remedies with respect to her Title VII sexual harassment claims because she did not timely file a complaint with the EEOC. Everson first filed a charge with the DCOHR, so she had 300 days from when the

alleged unlawful discrimination occurred to file with the EEOC.  *See Musgrove v. Gov't of the District of Columbia*, 458 F. App'x 1, 2 (D.C. Cir. 2012) (per curiam); *Simpkins v. Wash. Metro. Area Transit Auth.*, 132 F.3d 1482 (D.C. Cir. 1997) (per curiam).

Counts III and IV arise from alleged "unwanted sexual advances and sexual comments" made by Scott and Johnson and the hostile work environment they created.  Am. Compl. ¶¶ 87, 94–95.  Everson alleges that these events occurred between August 13, 2012, when Everson became a Congressional Fellow, and May 27, 2013.  *Id.* ¶¶ 20, 22–33.  The CBCF posits that if May 27, 2013 is the last date on which Scott sexually harassed Everson, the EEOC charge of discrimination must have been filed by March 22, 2014.  *See* Def.'s Mem. at 12.  Alternatively, if December 6, 2013, the date of Everson's termination from the CBCF, is the last date on which the discrimination occurred, her claim must have been filed by October 7, 2014.  *See id.*  Either way, because Everson did not file her EEOC charge until March 5, 2019, the CBCF argues that Counts III and IV must be dismissed as untimely.  *See id.*

"[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Dyson v. District of Columbia*, 710 F.3d 415, 421 (D.C. Cir. 2013) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)); *see Gupta v. Northrop Grumman Corp.*, 462 F. Supp. 2d 56, 59 (D.D.C. 2006).  Equitable tolling may be warranted when the plaintiff "shows '(1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way' and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  "The court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed instances."  *Smith-Haynie v. District*

*of Columbia*, 155 F.3d 575, 579–80 (D.C. Cir. 1998) (citing *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).  Everson asks the Court to equitably toll the limitations period for three reasons: (1) EEOC error, (2) CBCF pressure to abandon her rights, and (3) her alleged *non compos mentis* status during the relevant period.  *See generally* Pl.'s Opp. at 14–19.  None of these reasons are persuasive.

First, Everson argues that tolling of the limitations period is warranted because the EEOC "failed to process her claim or follow up" after she submitted the intake questionnaire in October 2014.  Pl.'s Opp. at 16.  But even if the EEOC should have contacted Everson, "[t]he Intake Questionnaire is not a Charge of discrimination," and "[t]he Questionnaire expressly reminds claimants that 'a charge of employment discrimination must be filed within the time limits imposed by law.'"  *Dyson*, 710 F.3d at 418.  By checking Box 1, indicating that she had *not* filed a charge, Everson acknowledged that she "could lose [her] rights if [she did] not file a charge in time."  ECF No. 20-3 at 4.  Everson claims that "[t]he EEOC did not make a finding or provide a notice to sue."  But because she never filed a claim, the EEOC need not have taken those steps.  Equitable tolling is not warranted in this circumstance.[6]  *Cf. Dyson*, 710 F.3d at 421–22.

Next, Everson argues that the Court should equitably estop the CBCF from asserting untimeliness because it "engaged in activity that it knew or should have known would cause [her to] delay . . . filing a complaint of discrimination" by asking that she sign a separation agreement.  Pl.'s Opp. at 17.  She argues that the separation agreement, the title of which is "SEPARATION AGREEMENT AND RELEASE OF ALL CLAIMS," ECF No. 8 at 180,

---

[6] Even if the Questionnaire could be construed as an EEOC charge, as the CBCF notes, Everson filed it on October 27, 2014, or 325 days after the last possible date on which she could have faced sexual harassment or a hostile work environment—26 days late.  *See* ECF No. 21 ("Reply") at 2.

"would prevent her from filing a complaint altogether," Pl.'s Opp. at 17.  But equitable estoppel, as distinct from equitable tolling,[7] operates only when the defendant has "taken active steps" or engaged in other "inequitable conduct" to "prevent a claimant from litigating its claims in time." *Bartlett v. Overslaugh*, 169 F. Supp. 3d 99, 106 (D.D.C. 2016) (quoting *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003)).  Everson cites no authority in this Circuit supporting the notion that either pressuring an employee to sign a separation agreement that releases claims or promising to help an employee's career prospects in exchange for not pursuing claims constitutes such inequitable conduct—and in any event, Everson refused to sign the separation agreement.  *See* Pl.'s Opp. at 17.  Further, the CBCF's pressure over the proposed separation agreement did not deter Everson from eventually pursuing discrimination claims with DCOHR and EEOC and from filing this lawsuit, and she does not explain why it would have prevented her from bringing her claims earlier, but not later on.  Ultimately, Everson does not show that the CBCF engaged in misconduct or inequitable conduct which induced her to allow her deadline to pass, and so equitable estoppel is not warranted here.

Finally, Everson argues that the limitations period should be tolled because she was *non compos mentis*, or mentally incapacitated, when she should have filed an EEOC charge.  *See* Pl.'s Opp. at 18–19.  Although a sufficient showing that a plaintiff was *non compos mentis* may be grounds for equitable tolling, the plaintiff's "hurdle is high."  *Smith-Haynie*, 155 F.3d at 579; *see also Haynes v. District of Columbia Water & Sewer Auth.*, 924 F.3d 519, 525 (D.C. Cir.

---

[7] The D.C. Circuit has suggested that equitable tolling might apply "[w]here the complainant has been induced or tricked by [her] adversary's misconduct into allowing the filing deadline to pass," *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).  For the same reasons that equitable estoppel is inapplicable, Everson has shown no such misconduct by the CBCF that would justify equitable tolling.

2019) (stating that the *non compos mentis* standard is the same under both federal and District of Columbia law).  "The disability of a person claiming to be *non compos mentis* must be 'of such a nature as to show [she] is unable to manage [her] business affairs or estate, or to comprehend [her] legal rights or liabilities.'"  *Smith-Haynie*, 155 F.3d at 580 (quotation omitted, alterations in original).  A plaintiff can show that she was *non compos mentis* by alleging facts showing that she was "[un]able to engage in rational thought and deliberate decision making sufficient to pursue [her] claim alone or through counsel," *Haynes*, 924 F.3d at 525 (quoting *Smith-Haynie*, 155 F.3d at 580) (alterations in original), such as by showing that she has been "adjudged incompetent, signed a power of attorney, had a guardian or caretaker appointed, or otherwise took measures to let someone else handle her affairs[.]" *Speiser v. U.S. Dep't of Health & Human Servs.*, 670 F. Supp. 380, 385 (D.D.C. 1986).  "It is not sufficient to show that a plaintiff was 'preoccupied, depressed, and obsessed with the events' he was experiencing." *Miller v. Rosenker*, 578 F. Supp. 2d 67, 72 (D.D.C. 2008) (quoting *Gupta*, 462 F. Supp. at 60).

Everson's representations fall well short of the demanding *non compos mentis* standard. She alleges that "[d]ue to Defendant's sexual harassment, [she] experienced her first bought of anxiety . . . which[] turned into a post traumatic stress/depression after the wrongful termination and retaliation."  Pl.'s Opp. at 18.  "[D]evastated" by her termination, Everson states that she returned to Michigan in May 2014 at the insistence of her grandmother, who raised her.  *Id.* at 7. Everson's grandmother then died, leaving her in "extreme anguish for months," during a time when she had also been diagnosed with anxiety and lost her health insurance.  *Id.*  She allegedly did not "eat, sleep, function normally or conduct any of her personal or legal affairs."  *Id.*  Not until October 27, 2014, did Everson "finally [come] to herself," file the EEOC Questionnaire, and have an interview with DCOHR.  *Id.* at 8.  But although Everson asserts that she did not

"conduct any of her personal or legal affairs" and was "incapable of function[ing] in society," she alleges few specific facts sufficient to support these conclusory allegations. Pl.'s Opp. at 7; ECF No. 20 at 2. Moreover, her other allegations about her activity in 2014 contradict this claim. For example, when she claims to have been *non compos mentis*, Everson authored her book and managed her ailing grandmother's affairs. *See* Am. Compl. ¶ 56; Pl.'s Opp. at 7; *see also Dahlman v. Am. Ass'n of Retired Persons (AARP)*, 791 F. Supp. 2d 68, 78 (D.D.C. 2011) (rejecting *non compos mentis* claim when the plaintiff "alleges that she was 'unable to function' because of her emotional breakdown, but she simultaneously claims that during this time she attempted to work from home and completed a chapter for the ABA on senior citizen law"). And she does not explain what "precipitated the eventual exercise of her legal rights" in October 2014. *Haynes*, 924 F.3d at 525. The Court does not doubt the serious personal challenges and misfortunes Everson faced, but she has not shown that she was mentally incapacitated such that tolling of the statute of limitations is appropriate.

Because Everson did not timely file a charge with the EEOC and no basis for equitable tolling or estoppel exists, the Court will dismiss Counts III and IV. *See Charles v. District of Columbia Dep't of Youth Rehab. Servs.*, 690 F. App'x 14, 15–16 (D.C. Cir. 2017) (per curiam).

### 2.      Title VII Retaliation (Count V)

Everson argues that the CBCF unlawfully retaliated against her after she filed an internal discrimination complaint with the CBCF by subjecting her to unwarranted discipline, terminating her fellowship, obstructing her job opportunities, causing her invitation to speak on a panel at the 2018 CBCF Annual Legislative Conference to be rescinded, and preventing a radio interview she recorded from airing. *See* Am. Compl. ¶¶ 104–05; Pl.'s Opp. at 25–26. As with Everson's discrimination claim, the CBCF argues that the portion of Everson's retaliation claim arising

from events before May 9, 2018, 300 days before she filed her EEOC charge, is time-barred.

Def.'s Mem. at 14.  Everson raises the same equitable tolling and estoppel arguments as she does

for her Title VII discrimination claims, and the Court again rejects them.  *See* Pl.'s Opp. at 23–

24.  The Court will dismiss those portions of Count V arising from events before May 9, 2018 as

untimely.

### 3.      DCHRA Discrimination (Counts VI and VII)

The CBCF argues that Everson's DCHRA sexual harassment claims are also untimely.

Def.'s Mem. at 12–13.  A plaintiff has one year from the discriminatory act, or her discovery of

it, to file a suit under the DCHRA, but a timely filing with the DCOHR tolls the statute of

limitations while it is pending.  D.C. Code § 2-1403.16(a).  The last day Everson could have

faced unlawful discrimination was December 6, 2013, the date of her termination, so the one-

year limitations period would have ended on December 6, 2014.  *See* Def.'s Mem. at 13.  The

filing of the 2014 DCOHR charge on October 27, 2014, or 325 days after her claim accrued, tolls

the limitations period.[8]  *See* Am. Compl. ¶ 54.  Upon the withdrawal of the DCOHR charge on,

at the latest, December 31, 2017, the limitations period began to run again, leaving Everson 40

days, until February 9, 2018, to file her lawsuit.  *See* Pl.'s Opp. at 21–22; Am. Compl. ¶¶ 54, 60.

Because Everson did not file her original complaint until September 11, 2019, the CBCF argues

that Counts VI and VII must be dismissed.  *See* Def.'s Mem. at 12–13.

Everson again asks the Court to equitably toll the statute of limitations, but here because

of "attorney abandonment."  Pl.'s Opp. at 21.  She explains that after her Fox News interview in

---

[8] Everson alleges in her complaint that she filed her DCOHR charge on October 27, 2014, but the charge form she attaches as an exhibit is not signed and dated.  Am. Compl. ¶ 54; *see* ECF No. 8 at 193.  The CBCF includes as an exhibit what looks like a signed version of the same form, dated October 31, 2014.  ECF No. 12-3 at 5.  But this discrepancy does not affect the Court's analysis.

November 2017, her attorney advised her to withdraw her DCOHR charge, and she did so at the latest in December 2017.  *Id.* at 21–22; Am. Compl. ¶¶ 54, 60.  She says that her attorney then "abandoned the case and dropped [her] as a client" on December 20, 2017, that she "attempted to work with her political counsel but he was physically attacked twice, and hospitalized," and that she was unable to secure other counsel in time.  Pl.'s Opp. at 22.  Everson asks that the limitations period "be equitably tolled due to her attorney's egregious conduct."  *Id.*  But "the attorney's misconduct must be 'extraordinary' before equitable tolling can be applied."  *Aaron v. Pompeo*, No. 17-cv-2507 (CKK), 2018 WL 5297813, at *8 (D.D.C. Oct. 25, 2018) (quoting *Holland*, 560 U.S. at 651–52).  Simply ending the attorney-client relationship, with notice to the client, is not such extraordinary misconduct.  *Cf. Galloway v. Watt*, 185 F. Supp. 3d 130, 134–35 (D.D.C. 2016) (finding that an attorney's "failure to file on time, combined with miscalculation of the relevant deadline, 'suggest[s] simple negligence,' not egregious or extraordinary malfeasance" (quoting *Holland*, 560 U.S. at 652)).  And even if Everson was unable to obtain counsel, she does not explain why she could not have proceeded *pro se*—as she eventually did— during the limitations period.  Because no basis for equitable tolling exists, Counts VI and VII must also be dismissed as untimely.

### 4.    DCHRA Retaliation (Count VIII)

The CBCF moves to dismiss as untimely those portions of Everson's DCHRA retaliation claim arising from events before September 11, 2018, one year before she filed her complaint. *See* Def.'s Mem. at 16.  Everson again argues that the statute of limitations should be tolled because of attorney misconduct and that the CBCF should be estopped from asserting the defense because of its own misconduct.  *See* Pl.'s Opp. at 30.  For the same reasons explained

above, the Court rejects these arguments, and will dismiss as untimely those portions of Count VIII arising from events before September 11, 2018.[9]

### 5.  Tortious Interference (Count IX)

Everson's claim for tortious interference with rights, business relations, and prospective economic advantage arises from the CBCF's alleged interference with her future unpaid internship with Representative Peters in 2014, her speaking engagement and relationship with the Women's Information Network ("WIN") in 2017, her book promotion and tours with Oracle Group in 2018, and her relationship with Livas and prospective appearance on her radio show in 2018.  Am. Compl. ¶¶ 133–38; Pl.'s Opp. at 36–39.  The CBCF moves to dismiss claims relating to her prospective 2014 internship as time-barred.  Under District of Columbia law, "claims for tortious interference with business relations and tortious interference with reasonable expectation of prospective economic advantage are subject to a three-year statute of limitations." *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 790 (D.C. Cir. 2019); *see* D.C. Code § 12-301(8).  As a result, any tortious interference claims arising before September 11, 2016, including Everson's claims relating to her prospective internship with Representative Peters, are time-barred.  Everson again argues for equitable tolling or estoppel based on EEOC error, the

---

[9] It is unclear whether *any* of Everson's claims are timely under the DCHRA, for which the statute of limitations bars claims arising from events before September 11, 2018.  *See* Def.'s Mem. at 17 n.11.  The only two potentially timely events are Everson's rescinded invitation to speak on a panel at the CBCF Annual Legislative Conference and her radio interview that did not air.  Everson's prospective panel appearance was set to take place on September 13, 2018, but she does not identify precisely when her invitation was rescinded, and on her EEOC charge she listed September 3, 2018 as the last date when any discrimination or retaliation occurred.  ECF No. 12-3 at 10.  And although Everson's radio interview was allegedly recorded on September 5, 2018, she has attached an exhibit to her complaint suggesting that it was supposed to air on September 12, 2018.  Am. Compl. ¶ 64; ECF No. 8 at 205.  Because "dismissal is appropriate on statute of limitations grounds 'only if the complaint on its face is conclusively time-barred,'" the Court declines to dismiss these claims as untimely.  *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019) (quotation omitted).

CBCF's malfeasance, and her alleged *non compos mentis* status, and the Court again rejects these arguments for the same reasons it did previously.  Pl.'s Opp. at 31–32.

### 6.    Intentional Infliction of Emotional Distress (Count X)

Finally, the CBCF argues that portions of Everson's intentional infliction of emotional distress (IIED) claim are time-barred.  Everson's IIED claim arises from her dismissal from the Financial Services Committee and from the CBCF's alleged interference with her speaking and book promotion opportunities.  *See* Am. Compl. ¶¶ 141–43.  Stand-alone IIED claims are subject to the three-year limitations period of D.C. Code § 12-301(8).  *See Thompson v. Jasas Corp.*, 212 F. Supp. 2d 21, 27 (D.D.C. 2002).  But when an IIED claim is "intertwined" with another cause of action that has a more specific limitations period under District of Columbia law, that limitations period governs the IIED claim as well.  *See Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997).  The CBCF argues that in this case, the statute of limitations is one year, because the IIED claim is "intertwined" with Everson's discrimination and retaliation claims under the DCHRA, which carry one-year statutes of limitations.  Def.'s Mem. at 19–20; *see Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997).  Everson concedes that point, but again argues that the statute of limitations should be tolled because of "attorney abandonment."  Pl.'s Opp. at 39.  The Court again rejects that argument and will dismiss the portion of her IIED claim arising from her 2013 dismissal from the House Financial Services Committee as time-barred, which would be the case no matter whether a one- or three-year statute of limitations period applied.[10]

---

[10] Everson alleges in her complaint that she "would have filed her claim in January of 2018" but for the "extreme emotional duress inflicted" by the CBCF and its agents.  Am. Compl. ¶ 144.  To the extent that Everson again argues that the statute of limitations should be tolled because she was *non compos mentis*, or that the CBCF should be estopped from asserting it because of its inequitable conduct, the Court again rejects these arguments as well.

**B.      Failure to State a Claim**

After the claims barred by the statutes of limitations are dismissed, the following remain:

the parts of Count V arising from events after May 9, 2018; the parts of Count VIII arising from

events after September 11, 2018; the parts of Count IX arising from events after September 11,

2016; and the parts of Count X arising from events after September 11, 2018.  The Court will

dismiss the remaining portions of Count X and part of the remaining portions of Count IX for

failure to state a claim.

**1.      Title VII and DCHRA Retaliation Claims (Counts V and VIII)**

Two potentially timely incidents are relevant to Everson's retaliation claims: the

rescinded invitation to speak on a panel at the CBCF Annual Legislative Conference on

September 13, 2018, and the radio interview with Livas, a host of the panel, that was recorded on

September 5, 2018 but was never aired.  *See* Am. Compl. ¶¶ 64, 105; *see also* ECF No. 12-3 at

10.[11]  The CBCF argues that Everson does not state a claim for either of these incidents, because

she cannot connect the alleged adverse actions to any protected activity.  The Court disagrees.

"Title VII bars retaliation against employees who participate in a Title VII proceeding or

oppose practices made illegal by Title VII."  *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir.

2016); *see* 42 U.S.C. § 2000e-3(a).  Retaliation claims based on circumstantial, rather than direct,

evidence of retaliatory motive are governed by the burden-shifting framework set out by the

Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Holcomb v. Powell*, 433

F.3d 889, 901 (D.C. Cir. 2006).  In such cases, the plaintiff must establish her prima facie case

---

[11] Because the relevant standards to state a claim of retaliation are "substantively the same" under
Title VII and the DCHRA, as are the parties' arguments, the Court will address the remaining
aspects of Counts V and VIII together.  *Williams v. District of Columbia*, 317 F. Supp. 3d 195,
199 (D.D.C. 2018); *see* Def.'s Mem. at 12–13; Pl.'s Opp. at 26–31.

by showing "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a
materially adverse action by [her] employer; and (3) that a causal link connects the two."
*Massaquoi v. District of Columbia*, 285 F. Supp. 3d 82, 87 (D.D.C. 2018).  Additionally, "a
plaintiff making a retaliation claim under [Title VII] must establish that his or her protected
activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. SW
Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The CBCF argues that Everson has not alleged a connection between her November 2013
report of harassment to the CBCF, a protected activity, and her canceled panel invitation and
radio interview about five years later.  Def's Mem. at 15.  But Everson *has* alleged that both
disinvitations resulted from the CBCF's retaliation.  Am. Compl. ¶ 65.  More specifically, she
alleges that the host of the panel, Livas, told her that she had been "un-invited [from the panel]
because she had a lawsuit filed against a CBC member." *Id.* ¶ 64.  True, Everson does not allege
that Livas told her she was told or pressured by the CBCF or a CBCF member to disinvite her.
But such an inference is plausible—i.e., enough to survive a motion to dismiss—for a few
reasons.  First, the panel took place at the CBCF's annual conference, and it is reasonable to
expect that the CBCF has a say in the content of its own event.  *See* Am. Compl. ¶ 64; ECF No.
8 at 201 (social media advertisement for the panel featuring the CBCF logo).  Second, it is
reasonable to infer that the only way Livas would have known that Everson had filed an
administrative charge with the DCOHR against the CBCF (she had not in fact sued a CBC
member or the CBCF at that time, and she had withdrawn the charge) was because someone
from the CBCF told her.[12]  Am. Compl. ¶¶ 54, 64.  The CBCF also argues that even if Everson

---

[12] Records and reports filed with DCOHR are "confidential and [are not] made available to the
public."  District of Columbia Office of Human Rights, Standard Operating Procedures for
Complaint Processing (October 2017), at 12, https://ohr.dc.gov/sites/default/files/dc/sites/ohr/

*had* alleged that the CBCF were responsible for the rescinded invitation, she has not pled that her protected activity was a but-for cause of her disinvitation.  But at the motion-to-dismiss stage, this element is satisfied by her allegation that the CBCF disinvited her because of her administrative or legal action against it.

For similar reasons, Everson also states a claim for retaliation as to her canceled radio interview.  Everson alleges that she recorded a radio interview with Livas on September 5, 2013, just days before the 2018 CBCF Annual Legislative Conference where she was supposed to speak, and that the interview was pulled and a different one aired as a result of CBCF interference.  *Id.* ¶¶ 64–65, 105.  Although Everson does not allege that Livas told her the interview's broadcast was scuttled because of Everson's protected activity against the CBCF, given Livas's role in both incidents and that they happened within a week of each other, Everson has stated a plausible claim for this incident as well.  *See* ECF No. 8 at 205; Pl.'s Opp. at 28–29.

Although it is a close call, Everson has ultimately "nudged" her claim that CBCF caused her to be disinvited from the 2018 panel and prevented her radio interview from airing as a result of her 2013 discrimination complaint or 2014 DCOHR charge "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Of course, to succeed, Everson must ultimately prove her claim with competent, admissible evidence.  But these claims survive a motion to dismiss.

### 2.   Tortious Interference Claim (Count IX)

Everson's timely tortious interference with business relations and prospective economic advantage claims arise from: (1) Everson's prospective speaking engagement and ongoing

_____

publication/attachments/OHR%20Standard%20Operating%20Procedures_October2017_FINAL. pdf; *see* Pl.'s Opp. at 38.  The Court takes judicial notice of the DCOHR Standard Operating Procedures as information posted on an official public website of a government agency. *Markowicz v. Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016).

relationship with WIN; (2) Everson's prospective panel engagement at the 2018 CBCF Annual Legislative Conference and relationship with Oracle Group; and (3) Everson's prospective radio interview and relationship with Livas.[13]  *See* Am. Compl. ¶¶ 133–38; Pl.'s Opp. at 36–39. Everson alleges that she was scheduled to speak about her book at a WIN event on November 27, 2017, and that her contact at WIN, who had been eager to work with her, "mysteriously cancelled" the event the day of and never got in touch with her again.  Pl.'s Opp. at 36–37.  And together with her allegations about the CBCF Annual Legislative Conference speaking event and Livas's radio show detailed above, she claims that the CBCF's interference ended her promising ongoing business relationships with Oracle Group and Livas, which would have allowed her "to sell and promote her book."  Am. Compl. ¶ 138; Pl.'s Opp. at 37.

Under District of Columbia law, a prima facie case of tortious interference with business or contractual relations requires: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages."  *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (cleaned up); *see Banneker Ventures, LLC v. Graham*, 225 F. Supp. 3d 1, 14 (D.D.C. 2016) (applying the same factors to tortious interference with prospective economic advantage).  The CBCF moves to dismiss this count because Everson has not sufficiently alleged intentional interference by the CBCF and because, it argues, claims for

---

[13] Everson does not include the prospective WIN engagement in Count IX of her complaint, but she discusses it in her opposition to the CBCF's motion to dismiss Count IX, and her complaint contains a similar allegation about a "Women's Democratic Network," which the Court infers is a reference to WIN.  Pl.'s Opp. at 36–37; Am. Compl. ¶ 57.  Because "a court considering a *pro se* plaintiff's complaint should look to all filings, including filings responsive to a motion to dismiss, to discern whether the plaintiff has nudged her claims across the line from conceivable to plausible," the Court will consider Everson's claims about WIN as part of Count IX. *Mehrbach*, 316 F. Supp. 3d at 268 (cleaned up).

tortious interference with contract, relationship, or business expectancy cannot arise from at-will employment. Def.'s Mem. at 19. As for the latter argument, the D.C. Court of Appeals clarified in *Newmyer v. Sidwell Friends School*, 128 A.3d 1023, 1039–40 & n.14 (D.C. 2015) that an employee may bring a case for tortious interference with at-will employment against a third party unaffiliated with the employer, so Everson's claims cannot be dismissed for this reason. *See generally Easaw v. Newport*, 253 F. Supp. 3d 22 (D.D.C. 2017).

CBCF's other argument, that Everson has not sufficiently pled that CBCF intentionally interfered with her business relationships or expectancies, succeeds with respect to the WIN event and relationship, but fails as to her other two claims. As for WIN, Everson alleges only that the group "mysteriously canceled" her engagement and ceased responding to her; she offers nothing but conjecture to suggest that this stemmed from the CBCF's tortious interference. Pl.'s Opp. at 36–37; Am. Compl. ¶ 57. Her conclusory allegations cannot survive a motion to dismiss. In contrast, as explained above, Everson plausibly alleges that she had ongoing business relationships with Oracle Group and Livas that would help promote her book that the CBCF interfered with. *See* Pl.'s Opp. at 9–10, 37–38; Am. Compl. ¶¶ 133–38.

For these reasons, Everson has pled a claim of tortious interference with business relations and prospective economic advantage as to her prospective panel engagement at the 2018 CBCF Annual Legislative Conference and relationship with Oracle Group, and her prospective radio interview and relationship with Livas.

### 3.      Intentional Infliction of Emotional Distress (Count X)

The only timely incidents relevant to Everson's IIED claim are her canceled panel invitation and radio show.[14]  *See* Am. Compl. ¶¶ 64, 142–43.  The CBCF argues that the allegations of the amended complaint do not rise to the IIED standard as a matter of law.  Def.'s Mem. at 20.  The Court agrees.

"To establish a *prima facie* case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002).  "Liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (cleaned up).  The standard is particularly demanding when a plaintiff brings an IIED claim in an employment discrimination case.  *See Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997); *see also Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984) (stating that "employer-employee conflicts do not, as a matter of law, rise to the level of outrageous conduct"); *cf. Green v. Am. Broad. Co.*, 647 F. Supp. 1359, 1362 (D.D.C. 1986) ("[M]ere employee-employer conflicts, even those marked by charges of sexual harassment, are not necessarily characterized by the degree of serious misconduct that gives rise to [IIED].").

Everson responds that she has alleged sufficient facts for an actionable claim.  *See* Pl.'s Opp. at 40–42.  She considers it "outrageous" that the CBCF "destroy[ed] [her] business

---

[14] As discussed in relation to Everson's retaliation claims, it is somewhat unclear whether any of her IIED claims arise from events after September 11, 2018, but because they are not clearly untimely, the Court will not dismiss them on that ground.

relationships with organizations . . . interested in doing business with [her] and having her speak

on their panels, do training, and sell her books" just because she spoke out against the sexual

harassment she allegedly suffered.  *Id.* at 41.  These acts, she asserts, are "outrageous in

character" and "go beyond all possible bounds of decency," and her termination caused her

"actual economic . . . and emotional harm."  *Id.* at 41–42.  For example, she alleges that she felt

embarrassment and anxiety when she lost her job; she avoided social interactions; she "was

broken emotionally in inexplicable ways."  *Id.* at 42.

But Everson cannot rely on events at or around the time of her termination, as any such

claims are time-barred.  And her allegations that the CBCF destroyed her business relationships

are simply not the type that courts have found are "beyond all possible bounds of decency."

*Homan*, 711 A.2d at 818.  *See, e.g.*, *Crowley v. N. Am. Telcomms. Ass'n*, 691 A.2d 1169, 1172

(D.C. 1997) (where plaintiff "alleges only that he was subjected to contempt, scorn and other

indignities in the workplace by his supervisor and an unwarranted evaluation and discharge,"

such "conduct is not in itself of the type" of an actionable IIED claim, even if "offensive and

unfair"); *King v. Kidd*, 640 A.2d 656, 670 (D.C. 1993) (finding conduct not extreme and

outrageous when a supervisor failed to respond to an employee's grievance which alleged that

she had been sexually harassed and that another supervisor had handled her complaint in a biased

manner).  The Court will therefore grant the CBCF's motion on Count X.

## IV.    Conclusion and Order

For the above reasons, Defendant's Motion to Dismiss, ECF No. 12, is **GRANTED IN**

**PART** and **DENIED IN PART**.  The motion is **DENIED** as to the portions of Counts V, VIII,

and IX arising from Plaintiff's rescinded speaking invitation at the September 13, 2018 CBCF

Annual Legislative Conference panel and her radio interview that was not aired; and it is

**DENIED** as to the portions of Count IX arising from Plaintiff's business relationships with

Oracle Group and Livas.  In all other respects, the Motion is **GRANTED**.

      **SO ORDERED**.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 16, 2020